31866.   CAMPBELL *v.* H. L. GREEN COMPANY INC.

Decided February 14, 1948.

478

480

Charles S. Reid, C. E. Gregory Jr., W. F. Lozier, for plaintiff.
*Bryan, Carter & Ansley,* for defendant.

FELTON, J. As is characteristic of cases on review involving an assignment of error on the grant of a nonsuit, the sole question for determination in this case is whether or not the plaintiff proved her case as laid. Under the allegations of the petition, the defendant's negligence consisted of: (1) its failure to provide handrails for the use of customers in going between the two floor levels; (2) allowing cartons of scarce foodstuff to be unpacked on its sales floor, which attracted a throng of customers, produced confusion, obscured the vision of customers so far as the floor and stairway areas were concerned, increased the possibility of items being dropped, and caused the salad dressing to be dropped on the floor and broken; and (3) the failure of the defendant to take immediate steps either to remove the substance from the floor or to block off the affected area. Counsel for the plaintiff in their brief contend that the factor of knowledge on the part of the defendant is not involved in the case, and they rely entirely upon that theory of negligence set forth in ground two of the alleged negligence of the defendant. Under their theory of the case, that negligence of the defendant had three results: (1) it provided a distraction, and the confusion prevented the customers from taking precautions which they ordinarily would have taken in going about in the store; (2) it made it impossible for customers to watch where they were stepping, since it was necessary to avoid collisions with other customers who were running to get mayonnaise; (3) the turmoil and confusion made it more possible and probable that someone would drop articles on the floor, particularly such articles as glass jars. The evidence regarding the occurrence was offered by the plaintiff herself, who testified: "I went over to get some bacon; when I got over there I didn't find bacon and I got spareribs. When I entered the F. & W. Grand's store I came in from Forsyth Street; I did not go on the same floor that I entered on, I went down the steps. When I went down the steps I went up two flights of steps and across a landing to the meat counter. At the time I went up these two steps over to the meat counter, I saw some kind of activity going on there; they had, you know, people were going up to your left to have their packages checked and then to your right was this

meat counter where I went to look for the bacon and on this right side from the counter . . was these cartons of mayonnaise or Miracle Whip salad dressing and everybody wanted to was getting jars of mayonnaise out of there, and I looked over in there, thinking that was the bacon, is the reason I seen it was Miracle Whip salad dressing. I then went on to the meat counter and bought some spareribs. . . At the time when I was at the meat counter buying the spareribs, I would say as best I could say that I was around ten or twelve feet from where the mayonnaise was being unpacked. After I bought my spareribs, I came back across this land and started down these two flights of steps; I was going down in there to get barbecue sauce for the spareribs that I accidentally found, and the last I remember, I stepped in something slick. . . After that they sat me up, different ones, they sat me up and someone—I am not quite sure but I think it was this gentleman with the glasses on—called another lady that was down in the basement—I go there shopping all the time, I remember faces, it was his face and this particular lady that they called, and he asked why had she—did she know this stuff was down there on the floor and why hadn't some of them cleaned it up. . . As to whether, when I was sitting there on the steps, I noticed the area that was covered by the mayonnaise and will I describe how it looked with respect to the area covered by the splattered mayonnaise, with respect to broken glass, with respect to what step it was on . . . that I remember: I couldn't say unless it was about five—four or five feet like that, because it was splattered like that, you know, on the step and down on the floor. The mayonnaise and broken glass were not on the top flight or middle step, they were on the step and on the bottom floor. I didn't see any on the top floor, on this landing, because I was partly on the landing and on the step. I couldn't say how big an area the splattered glass covered; around four or five feet, I guess; it was way out. I didn't see any containers that might have held that mayonnaise, such as a paper sack or a shopping bag or anything of that kind; I didn't pay that much attention. When I turned to leave that meat counter to go down into the grocery section, I went toward the boys who were unpacking the mayonnaise; I passed right by them, about as far as from here to that chair by them, because there

were just stacks of mayonnaise. During the time following my leaving the meat counter and the time I arrived at the step where I fell, I did not see or hear anyone drop a jar of mayonnaise. I would say the floor and the step in this basement were made of cement; I couldn't say wood or what, but I would say it was cement, that's what I would say; of course, I couldn't prove it. As to whether when I was at the meat counter and I turned to go down toward the grocery department and in the direction of the step, I could see the place on the steps or the area on the steps where I eventually slipped and fell: I could see the steps but, you see, there was quite a few people in there and there wasn't no opening, you know, just so many people in there passing and repassing until you wasn't looking right down on the floor to see just what—you was going on about your business, and that's when I stepped on it. . . I would say when I turned to leave the meat counter from the place where I fell that I was around twenty-five, thirty feet, something like that—twelve or fifteen, I can't judge feet. . . As to what was the nature, the general nature of the noise that was existing in the store while I was down there, was it a continuous loud noise so that I couldn't hear myself and I had to holler to be heard, or was it the usual normal noise or was it relatively quiet: people were just in there shopping, nobody was talking, making that much noise. When I first entered the store, walked down the steps from Forsyth Street and passed by these boys unpacking the mayonnaise, I did not see anything unusual on the floor; I passed right by where I fell coming back. I was at the meat counter at least ten minutes." On cross-examination the plaintiff testified: "When I passed right by there, there was nothing on the floor at that time at all, that I saw. . . I would have seen it probably if it has been there; I would not say it was there, I wouldn't say it wasn't there, that's all I know; I was more to the left of where I stepped down than I went across going up there. I passed right there practically the same distance, but I wouldn't say I stepped in the same steps going up that I did going down. . . In the grocery department you wait on yourself. . . As to whether these people I saw there when I came in the store, who were getting the salad dressing out of these containers, were waiting on themselves in taking them out: they were taking them out of the

cartons. If you got vegetables or cans or salad dressing, or ketchup or something like that, you went over and took that yourself and got your things together and then checked out at the counter. . . I have never bought anything out of cartons there." At one point in her testimony, the plaintiff stated: "After I was there and was trading at the meat counter, I never heard any mayonnaise drop on the floor. I don't know how that got there; I didn't drop it myself; no one with me dropped it, there was no one with me to drop it. I don't know who did drop it."

We are of the opinion that the plaintiff's evidence does not prove her case as laid. There is no explanation of how the mayonnaise came to be on the floor. Although the plaintiff alleged that it had been dropped there by a customer, and the defendant admitted that it had been dropped there by someone unknown to it, there is no evidence that the alleged negligence of the defendant in allowing the cartons to be unpacked on its sales floor, and the resultant crowding of customers around the cartons and the general confusion, were causally connected with the presence of the mayonnaise or salad dressing on the floor.

Under the theory of counsel for the plaintiff and the view which we have taken of the case, it is unnecessary to decide whether or not the court erred in excluding certain evidence regarding the question of whether or not the plaintiff would have heard the salad dressing dropped, as the purpose of that line of questioning was to establish the length of time the salad dressing had been on the floor, in an effort to charge the defendant with knowledge, either actual or constructive, of its presence on the floor.

The court did not err in granting the nonsuit.

*Judgment affirmed. Sutton, C. J., and Parker, J., concur.*